## THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* COLEMAN GAINES.

*v.*

## JOHN M. GARNER *et al.*

1. ELECTIONS—*what elections considered general—in a constitutional sense.* The annual November elections, provided for by legislative enactment, are general elections, within the meaning of the constitution.

2. TOWNSHIP ORGANIZATION—*order submitting question to the people—need not be entered of record in the court making it.* It is not necessary that the order made by a county court, for submitting the question of township organization to the people, should be spread upon its records, it appearing from the proceedings had subsequently before the court, that such order was in fact made; it is no objection that the clerk negligently omitted to spread it upon the record.

3. ELECTIONS—*vote cast at any general election—determines number of legal voters.* The vote cast at any general election is *prima facie* evidence of not only the result of the election, but also of the number of legal voters in the county. This presumption will be acted upon until rebutted, and the registry lists can not rebut or overcome it.

4. APPEALS—*from county court—in what cases an appeal will not lie.* In proceedings before a county court, under the law authorizing township organization, a decision by the court after election held, that township organization had been adopted, and the entry of an order appointing three commissioners to divide the county into towns, is not a decision or order from which an appeal is authorized by law.

5. TOWNSHIP ORGANIZATION—*report of commissioners—what it need not contain.* The report of the commissioners appointed to divide a county into towns, need not contain the reasons why township boundaries were not adopted by them, in making such division.

WRIT OF ERROR to the Circuit Court of Logan county; the Hon. JOHN M. SCOTT, Judge, presiding.

The opinion states the case.

Messrs. STUART, EDWARDS & BROWN, for the plaintiffs in error.

Messrs. PALMER & HAY, for the defendants in error.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a proceeding by *quo warranto*, in the Logan Circuit Court, upon an agreed state of facts ; that at the October term, 1859, of the Logan County Court, the petition of fifty legal voters of the county was presented, praying that the court would cause to be submitted the question of township organization to a vote of the people at the ensuing November election ; that the county court made an order and submitted the question to the voters of the county, but the order was not entered of record. Notices were given, the election was held, the vote returned and canvassed, and an abstract was prepared, which showed the total vote of the county cast at that election to have been 1426, and for township organization there were 973, and against the proposition there were cast 208 votes. At the December term of the county court the abstract was presented, and after being examined, it was decided and entered of record, that the question had been carried in the affirmative by the requisite number of votes, and the commissioners required by the law were duly appointed, but never acted or reported a division of the county into towns.

Afterwards, at the September term, 1865, a similar petition was presented, praying that the question of township organization should be again submitted at the ensuing November election ; that the court again caused the question to be submitted to a vote by requiring the clerk to give the requisite notices, but no order or entry of their action requiring the notices was spread upon their record ; that a vote was had on the question as required by the law, and there were cast 3054 votes, 1612 being in favor, and 700 opposed, to township organization. At the following December term the court decided that township organization had been adopted, and

appointed, by order of the court, three commissioners to divide the county into towns. From this action of the county court six of the tax payers of the county appealed to the Circuit court, which appeal still remains on the docket of that court, undisposed of or determined; that in January, 1866, the persons who appealed from the county court, filed a bill for an injunction, to restrain the county court and commissioners from further proceedings to complete township organization. The writ was issued in accordance with the prayer, but, at the following October term the injunction was dissolved, and at the April term of the court the bill was dismissed on the hearing, and an appeal prayed and perfected to the Supreme Court. On the 29th of February, 1867, the commissioners filed their report with the county clerk, showing the manner in which they had divided the county into towns. The clerk thereupon gave the requisite notices for the holding of town meetings, designating the time and place, and for the election of town officers provided for by law; that the election was held, and the persons named as defendants in this proceeding were respectively elected supervisors from the different towns, and the election was held and conducted in the mode prescribed by law; that on the 17th day of May the supervisors, after being qualified, assembled at the court house at the county seat, and organized a board of supervisors, and elected John M. Garner as Chairman.

That at and since the time of such organization they have acted as a board, and as such have conducted the affairs of the county. After this organization the county court ceased to transact county business, but it has met regularly at the appointed terms as though the county had not adopted township organization. It was further agreed, that the registry of votes taken under the law preceding the election in November, 1865, showed in the county 3,868 voters, and that of those who voted at that election, 158 voted upon affidavits without having been registered. The agreement is substituted for

pleadings in the case, and judgment rendered thereon as though formal pleadings had been filed and proof made. Also, that a *pro forma* judgment should be entered for respondents by the circuit court, that the case might be removed to the supreme court. The court rendered such a judgment, and the cause is brought to this court, and the rendition of the judgment is assigned for error.

The decision in this case depends upon the question whether the voters of Logan county have legally adopted township organization. Our constitution provides for county government in either of two modes. The first, and that which went into operation in all of the counties in the State on the adoption of that instrument, is provided for in the 19th section of article 5, which declares that the county judges, with such justices of the peace as may be designated by law, shall hold terms for the transaction of county business, and to perform such other duties as the general assembly may prescribe; *provided*, the general assembly may require two justices to be chosen by the qualified electors of each county, who shall act with the county judge in all cases. To carry this provision into effect, the act of 1849 established county courts in the several counties in the State, which continued in Logan county until the proceedings were had out of which this controversy has arisen.

The 6th section of article 7, provides for the mode of changing this county government to that of township organization, and declares that the general assembly shall provide, by a general law for such organization, under which any county may organize whenever a majority of the voters of such county, at any general election shall so determine, and whenever any county shall adopt such government, so much of the constitution as provides for the management of the fiscal concerns of the county, by the county court, may be dispensed with, and the affairs of the county may be transacted in such manner as the general assembly may provide. The general assembly, to

32—47TH ILL.

give operation to this provision of the constitution, passed the act of 1849, which was repealed by the act of 1851, which, with its amendments, is still in force, and it provides for the manner in which the county may so organize, and prescribes the duties of the various county and town officers.

This latter act declares, "that at any general election that may be holden in the several counties in this State, the qualified voters in any county may vote for or against township organization in any county in this State." The second section directs the county court, on the petition of fifty legal voters of the county, to cause the question to be submitted to the voters. In this case no question is made on the number or qualification of the persons signing the petition upon which the county court acted, or the power of the court to submit the question to a vote. It will also be observed that at the election in 1859, a large majority of those voting at that election were in favor of township organization, and that there was then no registry law, nor is there any evidence that the entire vote of the county was not polled.

It is, however, urged that the elections in 1859 and 1865 were not general, in the sense of the constitution. That instrument, by article 6, section 9, declares that the general elections shall be held biennially, on the Tuesday after the first Monday in November, until otherwise provided by law. And in the case of the *Town of Ottawa* v. *County of La Salle*, 11 Ill. 654, it was held that the general assembly, in the exercise of the power thus conferred, have provided for annual general elections in November of each year. To give a different construction to the law would unsettle township organization, no doubt, in many counties of the State, and that, too, perhaps, induced by the decision in that case. The case seems to have been well considered and deliberately determined and we feel no disposition to disturb the construction there given to the law.

It is urged that the county court made no order for submitting the question to the people. The agreed state of facts shows that an order was in fact made, but that it was never spread upon the record of their proceedings by their clerk; the agreement in reference to the election in 1859, states "that said county court, at said term, upon said petition, caused said question to be submitted at said ensuing election," and in both instances it is stated that it was done by causing the clerk to give the required notices ; and, in both cases, the county court, at the next term succeeding the election, approved of the act of the clerk, recognized the elections as regular and held under its authority, and they appointed commissioners to divide the county, all of which was recorded. The power to hold the election under the law flows from the action of the county court. It is not vested in the clerk or other officer. Their acts, unauthorized, would confer no power to hold an election ; but when the body has acted who possess the power, and the officer acting under their requirements gives the notice, then the authority of the law has been invoked and properly put into action.

The substance of the matter was the determination of the county court while acting as such, arriving at and announcing the determination of the body to allow or to reject the prayer of the petition. The entry of the resolution was form, and only material as a matter of evidence that the substance had, at the proper time, been in existence. It would be fraught with great public inconvenience if it were held that a careless, incompetent or perverse officer, might, by failing to record such an order, disorganize a county, and render the acts of the county and town officers invalid and inoperative. In this case, so far as we can see, all the requirements of the law have been performed, and shall it be said that the failure of a negligent clerk to record an order admitted to have been made, shall defeat the object of the law, and change the county

government? We think not, unless the requirements of the law are imperative that such shall be the result.

The statute does not require the order to be spread on the record. And, although it is necessary to have record evidence that such an order was made, the proceedings of the county court afford that evidence, as the court, at the term after each election, received and acted upon the certificate of the result of the election which they had caused to be held, appointed commissioners, and thus fully recognized their previous acts in causing the election to be held. It is true, if it did not appear that the court had caused the election to be held, as it is admitted it did, or if it appeared that the election had been held without their action, such a recognition would not have cured the want of legal power to hold the election. But as the proper resolution was arrived at by the court, and as they caused it to be acted upon, the mere failure of the clerk to perform his duty in recording an order of the court admitted to have been made, should not change the organization of the county, and defeat the will of the people, if there is no other more serious and fatal objection. So far as this record discloses, the election was fair and fully reflected the will of the majority of the voters who participated in the election. In such cases, it is not usual to permit mere formal and purely technical objections to control a decision.

It is again urged, that the organization failed for the want of a majority of the legal voters of the county, as required by the constitution. It is a question of some difficulty to determine how it may be ascertained whether the majority of the voters of the county had cast their votes in favor of township organization. If we take the vote actually polled as being evidence of the number of the voters of the county, then the means are plain and of easy application. But if any other mode be resorted to, there must result great inconvenience, uncertainty and delay. It is said that the registry of the vote immediately before the election in 1865, affords a

more reliable rule. We fail to see that it can, and it is illustrated in this case, as 158 votes were cast by persons whose names were not on the registry list. It thus appears that to that extent it was certainly incorrect; and, for ought we know, all those failing to vote, whose names were registered, may not have been legal voters.

The officers are required to take the full list of the next preceding election and correct it by striking off and adding to it until it embraces all the voters in the precinct; and when we see that the officers failed to correct the lists by adding names of such a number, who were shown to have been entitled to, and did vote, we may well conclude that names were, on the other hand, retained, who were not legal voters, by reason of having left the town, county or State. We therefore regard the registry lists as affording no more or better evidence than the poll books. It is true, it would be exceedingly hard, if it were even possible, to ascertain with certainty the true number of legal voters in the county, unless a legal proceeding could be instituted, by which the legal right of each person to vote could be determined. As was said in the case of *The People ex rel.* v. *Warfield*, 20 Ill. 159, the constitution must in this, as in all other of its requirements, have such a construction as will give it practical effect and operation. Any other virtually abrogates its provisions. In this case, as in that, we must hold that the vote cast is *prima facie* evidence of not only the result of the election, but also of the number of legal voters in the county, and that this presumption will be acted upon until it is rebutted, and that the registry lists do not rebut or overcome the presumption. But, in reference to the first election, there is no pretense that a majority of all the voters of the county did not vote.

It is also urged, that the second submission was unauthorized, as the vote had been previously taken, resulting in a majority in favor of township organization, and the statute confers no authority for a second election on the subject until

the organization is complete, and then to determine whether it shall be continued. If the first election was legal, then the other was unnecessary, and even if it was without warrant of law, it could not affect the legality of the first. It could not invalidate it. Or if the first, by the lapse of time, had ceased to be operative, we can see no objection to again submitting the question to a vote in the mode prescribed by law. If the first election had not ceased to be operative, then the appointment of commissioners to divide the county will be held to operate to carry into effect the result of that election, and if it had become inoperative, then their appointment should be referred to the latter election, and so of their report and all subsequent proceedings.

It is insisted, that the commissioners were not authorized to proceed to divide the county into towns after the appeal was perfected, as it suspended all right to proceed until the case was determined. The first section of the amendatory act of 1851, (Scates' Comp. 312) is referred to as authorising an appeal from the action of the county court in appointing commissioners. The act declares that appeals may be taken from any decision or order of the county courts of this State, made while performing the duties heretofore conferred on the county commissioners' court, by any person feeling himself aggrieved. We may look in vain to find that power was ever conferred on the county commissioners' court, to do any act or to perform any duty relating to township organization, and the act limits the appeal to orders and decisions the commissioners were authorized to make. It then follows that, as the county commissioners had no power to appoint commissioners to divide the county into towns, for the purposes of township organization, the appeal was not authorized by this act.

It is lastly urged, that the commissioners disregarded the law in dividing the county into towns. The sixth section of article one, of the township organization law, (Scates' Comp.

324), declares that the commissioners shall proceed to divide
the county into towns by making as many towns as there are
townships, according to government surveys.   To this gen-
eral requirement there are several exceptions; first, where
there are fractions caused by county lines not corresponding
with township lines, in which case they may attach such frac-
tions to adjoining towns; second, where the inhabitants or the
amount of territory shall not be sufficient for a separate town,
when it may be added to another town, or divided and added
to two or more adjoining towns; and lastly, where creeks or
rivers may so divide a township as to be inconvenient for
transacting town business, then such river or creek may be
made the town boundary, and the fractions may be disposed
of as fractions caused by county lines.

Under this enactment the commissioners are authorized,
when either of these causes exists, to form the towns variant
from the surveyed townships.   There is no evidence in the
record from which it can be inferred that those causes did not
exist.   It is, however, said that the report should show that
there were the statutory reasons for forming the towns in the
mode adopted.   The eighth section of the same act declares
that the commissioners shall make a written report of their
proceedings, giving the names and the boundaries of each
town, and present the report to the county court, etc.   It is
not required that the report shall contain the reasons why the
boundaries of townships have not been adopted.   Had the
legislature regarded it as necessary, they would, no doubt,
have required it.   It may be that if legal reasons did not
exist for such changes, and exceptions were taken, on the
return of the report, and before its approval, it would be
rejected, and recommitted for the further action of the com-
missioners, but that question is not before us, and is, there-
fore, not determined.   This report conforms to the require-
ments of the eighth section, and it must be presumed that it

is in accordance with the requirements of the law and is sufficient.

After a careful examination of this record, and the objections urged against the proceeding, we are unable to perceive that there has been any substantial or material departure from the requirements of the law. There is no valid objection to the organization of this county under the statute which prescribes the mode of procedure, and the judgment of the court below must be affirmed.

*Judgment affirmed.*